UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| KARLA MILLER,<br>        *Plaintiff*,<br>    *v.*<br>THE HOUSING AUTHORITY OF THE CITY OF<br>NEW HAVEN and THE CONNECTION, INC.,<br>        *Defendants*. | Civil No. 3:13cv1855 (JBA)<br><br>June 24, 2014 |

**RULING ON MOTIONS TO DISMISS**

Plaintiff Karla Miller brings this employment discrimination action against Defendants the Housing Authority of the City of New Haven ("HANH") and The Connection, Inc. ("TCI"), alleging that her employment was terminated based on her race, gender, and the exercise of her First Amendment rights.  Plaintiff asserts claims pursuant to Title VII of the Civil Rights Act of 1964 (Counts One and Two), Conn. Gen. Stat. § 31-51q (Counts Three and Four), 42 U.S.C. §§ 1981, 1983 (Count Five), and the Connecticut common law of tortious interference with contract (Count Six).    (Am. Compl. [Doc. # 24].)  TCI now moves [Doc. # 25] to dismiss Counts One through Three, arguing that Plaintiff failed to exhaust her administrative remedies with respect to Counts One and Two, that Count Two is untimely, and that Plaintiff has failed to state a claim for which relief can be granted with respect to Count Three.  HANH moves [Doc. # 27] to dismiss Counts Four through Six, arguing that Plaintiff has failed to state a claim for which relief can be granted with respect to each of these counts.  Plaintiff counters that she has properly exhausted her administrative remedies, her claims are timely, and she has alleged sufficient facts to support each of her claims.  For the following reasons, TCI's motion to dismiss is denied, and HANH's motion to dismiss is granted in part and denied in part.

I.      **Background**

In 2009, Plaintiff, an African American woman, was hired by Also-Cornerstone as a Case Manager I.  (Am. Compl. [Doc. # 24] ¶ 10.)  In January 2010, Also-Cornerstone merged with TCI, a nonprofit human services and community development agency that receives funding from HANH, a local housing authority that provides affordable housing to the residents of New Haven, Connecticut.  (*Id.* ¶¶ 8–9, 25.)

In her capacity as a Case Manager I, Plaintiff was assigned to the Ruoppolo Manor Supportive Housing Program ("Ruoppolo").  Ruoppolo is a collaborative effort between HANH and the Connecticut Department of Mental Health and Addiction Services to offer services to at-risk populations, including the chronically homeless and individuals with a history of mental illness and substance abuse.  (*Id.* ¶ 11.)  It is located in a high-crime neighborhood in Fairhaven.  (*Id.* ¶ 12.)  When Plaintiff was first hired, the elderly and disabled residents of Ruoppolo were living in unsanitary and unsafe conditions.  (*Id.* ¶ 13.)  The security at Ruoppolo was ineffective, and the New Haven Police Department was reluctant to respond to emergency calls in the area, leaving the building open to squatters, drug dealers and users, and prostitutes.  (*Id.* ¶¶ 14–15.)  Plaintiff immediately raised concerns about the unhealthy and unsafe conditions at Ruoppolo with her employer, but her criticism only provoked jests from her colleagues that her efforts to improve the building would be futile.  (*Id.* ¶¶ 17–19.)

In October 2009, less than two months after she was hired, Plaintiff was promoted two levels by Also-Cornerstone to the position of Assistant Program Director at Ruoppolo.  (*Id.* ¶ 20.)  In this new position, Plaintiff reached out to the New Haven Police Department to gain police assistance and cooperation in improving the safety and security of the Ruoppolo residents.  (*Id.* ¶ 21.)  Lieutenant Cassanova of the New Haven

Police Department responded by ordering an increased police presence at Ruoppolo and assigning Sergeant Herb Johnson to assist with the cleanup of the neighborhood. (*Id.* ¶ 22–23.) As a result of this cooperation, conditions at Ruoppolo began to improve. (*Id.* ¶ 24.)

When TCI merged with Also-Cornerstone in January 2010, Plaintiff reiterated her concerns regarding the conditions at Ruoppolo to TCI. (*Id.* ¶ 27.) She provided a detailed account of the inadequacies of the facility in a four-hour meeting with Quality Improvement Specialist Lisa Hansen. (*Id.*) During this meeting, Plaintiff also provided Ms. Hansen with a copy of an article from the New Haven Independent that discussed the conditions at Ruoppolo. (*Id.* ¶ 28.) Although TCI did not block Plaintiff's improvement efforts, it did not provide her any of the direct aid or assistance that had been promised in her meeting with Ms. Hansen. (*Id.* ¶ 29.) Plaintiff continued to be a target of animosity, hostility, and jests from TCI's upper management. (*Id.* ¶ 35.)

Plaintiff also voiced her concerns to HANH during her mandatory weekly meetings with HANH's management. (*Id.* ¶ 30.) HANH provided Plaintiff with support and assistance for her improvement efforts, including by directing the maintenance staff at Ruoppolo to address the complaints and facilitating the coordination between Sergeant Johnson and HANH security personnel at Ruoppolo. (*Id.* ¶¶ 32–34.) Both Plaintiff and Sergeant Johnson made regular status reports to HANH, in addition to reporting to TCI, regarding their improvement efforts at Ruoppolo. (*Id.* ¶ 37.)

In February 2011, TCI discussed nominating Sergeant Johnson, whose contributions had been recognized by both Defendants, for its Consumer Client Award, which is awarded to a private citizen with outstanding character. (*Id.* ¶ 41.) Plaintiff's supervisor, LeeAnn Borkowski, suggested that he be nominated based on his dedication

to the cleanup efforts at Ruoppolo.  (*Id.* ¶ 42.)  TCI ultimately decided to present Sergeant Johnson with the award later that year.  (*Id.* ¶ 44.)

In early March 2011, Sergeant Johnson was contacted by a reporter from the New Haven Independent who informed him that he would be featured in the paper's "Cop of the Week" series based on his efforts at Ruoppolo.  (*Id.* ¶ 45.)  Sergeant Johnson told Plaintiff about the call and advised her that he had informed the reporter that Plaintiff was his partner and should be included in the interview.  (*Id.* ¶¶ 45–46.)  Sergeant Johnson represented that he would also inform HANH about the upcoming interview, (*id.* ¶ 47), and Plaintiff informed Ms. Borkowski about the interview after Ms. Borkowski asked Plaintiff to obtain biographical information about Sergeant Johnson for the upcoming award ceremony.  (*Id.* ¶ 48–49.)  The two women discussed the interview and the New Haven Independent.  (*Id.* ¶¶ 50–52.)  Ms. Borkowski expressed her enthusiasm and asked Plaintiff to let her know how the interview went.  (*Id.*)  Before the interview, neither Ms. Borkowski nor any other TCI employee mentioned any policy or procedure regarding media statements or interviews.  (*Id.* ¶ 53.)

In early April 2011, TCI promoted Plaintiff to Program Manager at Ruoppolo. (*Id.* ¶ 38.)  She was required to sign her new job description, but received no policies, handbooks, or procedures from TCI with respect to this new position.  (*Id.* ¶ 39.)  At the time of Plaintiff's promotion, Ms. Borkowski reported that she had not witnessed such improvement in her more than sixteen-year career and stated that Ruoppolo was being managed and run the best it had ever been run.  (*Id.* ¶ 43.)

However, Plaintiff alleges that Ms. Borkowski actually was ambivalent about Plaintiff's promotion, because she had been recruiting Frank Grasso, a Caucasian male, to fill the position and had encouraged him to apply for the position even though she had

previously said Mr. Grasso was not qualified for the lower Case Manager 1 position. (*Id.* ¶¶ 108, 110.) Ms. Borkowski eventually promoted Mr. Grasso three levels to Assistant Director, bypassing Plaintiff. (*Id.* ¶ 111.) In this position, Mr. Grasso behaved in an insubordinate manner toward Plaintiff. (*Id.* ¶ 112.) After repeated complaints by Plaintiff regarding this behavior, Ms. Borkowski sent an email informing the staff that Plaintiff was the interim director of Ruoppolo and that all decisions, requests, and approvals had to go through her. (*Id.* ¶ 113.) Nonetheless, Mr. Grasso continued his insubordination, and Ms. Borkowski ignored Plaintiff's continuing complaints about him. (*Id.* ¶ 114.) Plaintiff's immediate supervisor, Debra Dejarnette, attempted to address Mr. Grasso's insubordination, but her efforts proved ineffective because Ms. Borkowski was overly tolerant of his behavior. (*Id.* ¶ 115.) On one occasion, when Plaintiff was preparing to report Mr. Grasso for failure to follow mandated procedures, Mr. Grasso got in Plaintiff's face, called her names, and blocked her from leaving her chair. (*Id* ¶ 116.) Plaintiff notified Ms. Borkowski of the incident, but Mr. Grasso was not disciplined and was permitted to interview for the Program Director position. (*Id.* ¶¶ 117–18.) Plaintiff ultimately was awarded the position, but Ms. Borkowski informed her that if Mr. Grasso had not verbally and physically threatened Plaintiff, he would have received the position instead. (*Id.* ¶ 118.)

On May 25, 2011, the New Haven Independent published an article entitled "Sarge, Social Worker Rescue Ruoppolo's Seniors," which quoted statements from Plaintiff's interview. (*Id.* ¶¶ 54–55.) These quotes described the past conditions at Ruoppolo that had prompted Plaintiff's efforts to begin a cleanup project there. (*Id.* ¶¶ 56, 58.) That day, which was the day of the awards ceremony for Sergeant Johnson, Plaintiff received accolades from her co-workers and supervisors regarding the article via

an email chain started by TCI's Senior Director, Marcie Dimenstein.  (*Id.* ¶¶ 63, 66–68.) TCI's CEO, Peter Nucci, also congratulated Plaintiff about the article and about her work at Ruoppolo at the awards banquet that evening, and TCI's Director of Case Management, William Gilbert, sent an email congratulating everyone on the award ceremony.  (*Id.* ¶¶ 67, 70–71.)

The next day, Plaintiff was summoned to a meeting with Lynn Spencer, TCI's Vice President of Human Resources and Risk Management, Ms. Borkowski, and Mr. Gilbert, all Caucasian.  (*Id.* ¶¶ 72, 102.)  Mr. Nucci was also present in the hallway while the meeting took place, but did not actually attend.  (*Id.* ¶ 74.)   At the meeting, Plaintiff was informed that she had offended TCI's funder—HANH—and that she had violated TCI's media policy by getting up on her "soap box" and promoting herself in the article in the New Haven Independent.  (*Id.* ¶ 75.)  During the meeting, Ms. Borkowski denied that Plaintiff had told her in advance about the interview (*id.* ¶ 77), and Ms. Spencer orally terminated Plaintiff, telling her that she had "tempered the relationship with a funder," that there was "no room for people like her in leadership roles," (*id.* ¶ 78), and that she would "have to pay" for offending a funder (*id.* ¶¶ 79, 83).  Plaintiff was instructed to immediately hand in her Blackberry and keys, told that her personal effects would be mailed to her, and was admonished not to return to Ruoppolo.  (*Id.* ¶¶ 80–81.)  Ms. Spencer, Ms. Borkowski, and Mr. Gilbert then told Plaintiff that they liked her passion, but could not agree with her publicly.  (*Id.* ¶ 84.)  They also offered Plaintiff a lower-level position in the Torrington office.  (*Id.* ¶ 85.)  That day, TCI memorialized the termination in a letter that Plaintiff believes is inaccurate, but continued to contact her for the next week to offer her the Torrington position, which Plaintiff declined.  (*Id.* ¶ 86.)  TCI also

posted a statement on the New Haven Independent's website approximately an hour after the meeting, disavowing Plaintiff's comments in the article. (*Id.* ¶ 88.)

Plaintiff timely filed employment discrimination charges with the Equal Employment Opportunity Commission (the "EEOC") within 180 days of these events. (*Id.* ¶ 5.)  Nearly two years later, on September 10, 2013, Plaintiff received a right-to-sue letter from the EEOC.  (*Id.* ¶ 6.)[1]  After she commenced this suit, the EEOC verbally informed Plaintiff that the letter had been issued in error, and that a valid letter would be issued by the Department of Justice.  (*Id.*)[2]

## II.   Discussion[3]

### A.   TCI's Motion to Dismiss

TCI's motion to dismiss argues that Plaintiff failed to exhaust her administrative remedies with respect to Counts One and Two, that Count Two is untimely, and that

---

[1] Neither the EEOC complaint nor the right-to-sue letter are attached to the Amended Complaint.  TCI has attached Plaintiff's EEOC complaint and the documents from Plaintiff's dually filed CHRO complaint to its motion to dismiss.  (*See* Exs. A–E to TCI's Mot. to Dismiss.)  However, neither party addresses whether or not the Court may properly consider documents outside of the complaint on this motion to dismiss.  Presumably, Plaintiff's EEOC complaint is incorporated by reference, and thus the Court may consider it.  However, Plaintiff makes no mention of dually filing her complaint with the Connecticut Human Rights Organization (the "CHRO"), or any reference to her compliance with the administrative procedures of that agency, in the Amended Complaint.

[2] The Amended Complaint contains no information as to whether Plaintiff has received such a replacement right-to-sue letter.

[3] "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  Although detailed allegations are not required, a claim will be found facially plausible only if "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Iqbal*, 556 U.S. at 678.  Conclusory allegations are not sufficient.  *Id.* at 678–79; *see also* Fed. R. Civ. P. 12(b)(6).

Plaintiff has failed to allege sufficient facts to state a claim pursuant to Conn. Gen. Stat. § 31-51q in Count Three.

           1.       *Exhaustion of Administrative Remedies—Counts One and Two*

TCI argues that Plaintiff's Title VII claims should be dismissed based on Plaintiff's failure to exhaust her administrative remedies in that her right-to-sue letter from the EEOC is invalid and the Connecticut Human Rights Organization (the "CHRO") dismissed her complaint because she failed to appear at its initial fact-finding hearing, which was held after she filed this suit.

Title VII requires that a plaintiff exhaust her administrative remedies by timely filing a complaint with the EEOC, obtaining a right-to-sue letter, and filing suit within ninety days of the receipt of that letter.  42 U.S.C. § 200e-5(e)–(f).  Although exhaustion of administrative remedies is "an essential element [of a Title VII claim], and one with which defendants are entitled to insist that plaintiffs comply," *Francis v. City of New York*, 235 F.3d 763, 768 (2d Cir. 2000), the Second Circuit has recognized that "a plaintiff's failure to obtain a notice-of-right-to-sue-letter is not a jurisdictional bar, but only a precondition to bringing a Title VII action that can be waived by the parties or the court," *Pietras v. Bd. of Fire Comm'rs of the Farmingville Fire Dist.*, 180 F.3d 468, 474 (2d Cir. 1999).

TCI argues that because Ms. Miller was notified subsequent to filing suit that the EEOC improperly issued her right-to-sue letter, and she has subsequently failed to produce a validly issued letter, she has not exhausted her administrative remedies and her Title VII claims should be dismissed.  TCI does not dispute that she timely filed her complaint with both the CHRO and the EEOC, and that her complaint was pending for approximately two years before either agency took any action, thereby satisfying the

sixty-day deferral period to the state agency.  TCI relies on Plaintiff's allegation that she was verbally informed, subsequent to filing suit, that the right-to-sue letter should not have been issued, from which it argues that she has failed to comply with the administrative exhaustion requirement.  Plaintiff counters that she should not be held responsible for the error of a governmental agency, and that she was entitled to rely in good faith on the letter when she filed suit.

Neither party offers any authority addressing a similar situation.  However, even if the alleged invalidity of the right-to-sue letter could represent a failure to exhaust administrative remedies, the Court may waive such failure to exhaust.  There is a split of authority among the district courts of this Circuit with respect to what showing is required to justify a judicial waiver of the right-to-sue letter requirement.  Waiver has been found appropriate where "the plaintiff shows or alleges that [s]he made an effort to procure the right to sue letter or that [s]he raised the failure to issue a right to sue letter with the EEOC prior to filing a federal court action."  *Gonzalez v. City of New York*, 354 F. Supp. 2d 327, 333 (S.D.N.Y. 2005).  Other courts, however, have set forth a higher standard, holding that "some extraordinary event such as an error by the EEOC in addition to mere diligence by a plaintiff is required to justify an equitable modification of the statutory requirement."  *Wiercinski v. Mangia*, No. 09 Civ. 4413 (ILG) (JO), 2012 WL 2319142, at *7 (E.D.N.Y. June 19, 2012).  *Cf. Pietras*, 180 F.3d at 474 ("Given that Pietras made a diligent effort to obtain a notice-of-right-to-sue letter from the EEOC and was denied one on the erroneous basis that she was not an employee, we believe the district court acted well within its discretion by excusing the absence of such a letter in this case.").

9

Based on the facts alleged in the Amended Complaint, Plaintiff appears to satisfy both of these lines of authority.  Plaintiff was diligent in obtaining the EEOC letter before filing suit, had fulfilled the antecedent requirement of a timely filed administrative complaint and compliance with the sixty-day deferral period and the 180-day waiting period before requesting such a letter, she was not informed of the EEOC's error until after she had already filed suit, and her conduct played no role in the error.  Plaintiff relied in good faith on the original letter issued by the EEOC in filing her federal suit within ninety days of its issuance, and to require her to withdraw her suit to await a replacement letter from the EEOC would leave Plaintiff at risk of her claims becoming time-barred as a result of governmental agency error beyond her control.  Under these circumstances, the Court waives the requirement of a replacement right-to-sue letter, and denies TCI's motion to dismiss on this ground.

TCI further argues that Plaintiff failed to exhaust her administrative remedies with respect to her Title VII claims because the CHRO dismissed her complaint when she failed to appear at the CHRO fact-finding hearing.  TCI cites two cases from other circuits holding that a plaintiff's failure to cooperate with the administrative fact-finding process was a bar to suit.  In *Austin v. Winter*, 286 F. App'x 31, 37 (4th Cir. 2008), the Fourth Circuit held that the plaintiff, as a federal employee, was required to cooperate with the Defense Department's Office of Complaint Inquiry fact-finding hearing in order to pursue her Title VII claim.  The court was careful to distinguish, however, between federal employees, who are required to cooperate in the administrative process, and private-sector employees, who are not.  *Id.* at 35.  In *Shikles v. Sprint/United Mgmt. Co.*, 426 F.3d 1304, 1317 (10th Cir. 2008), the court held that the plaintiff's failure to cooperate with the EEOC's investigation constituted a jurisdictional bar to her ADEA claim where

the EEOC dismissed the plaintiff's complaint ninety-one days after it was filed because the plaintiff "repeatedly cancelled interviews with the EEOC investigator, failed to return the investigator's calls, and failed to submit information requested by the investigator." *Id.* at 1307.

Unlike both *Austin* and *Shikles*, Plaintiff here is alleged to have failed to participate in the state administrative agency's hearing procedure, rather than any federal agency proceedings. Further distinguishing these cases, Plaintiff here had already obtained a right-to-sue letter from the federal agency before her alleged failure to cooperate with the CHRO and the subsequent dismissal of her CHRO complaint. As this Court has previously recognized, where a plaintiff has previously obtained a right-to-sue letter from the EEOC, the status of any pending CHRO complaint is immaterial to the district court's jurisdiction over that plaintiff's Title VII claims. In *Johnson v. Fleet*, 371 F. Supp. 2d 155 (D. Conn. 2005), the plaintiff dually filed a complaint with the EEOC and the CHRO and obtained a right-to-sue letter from the EEOC after the sixty-day deferral period and the 180-day waiting period had passed. *Id.* at 158–59. While her Title VII claims were pending in federal court, her administrative complaint remained pending before the CHRO. This Court held that the plaintiff had properly exhausted her claims because she had filed only federal claims in the pending action, and the EEOC had complied with the sixty-day deferral period to the CHRO, noting that "nothing in the statutory framework suggests that further deference to state anti-discrimination agencies is necessary before the EEOC may authorize commencement of a federal suit." *Id.* at 159 (quoting *Guse v. J.C. Penney Co., Inc.*, 562 F.2d 6, 8 (7th Cir. 1977) ("Nothing in [Section] 2000e-5(c) even remotely suggests that state procedures must be exhausted before federal action may continue.")). Therefore, Plaintiff's compliance or non-compliance with the

CHRO was immaterial to the exhaustion of her Title VII claims once she obtained a right-to-sue letter from the EEOC.  Consequently, TCI's motion to dismiss Counts One and Two for failure to exhaust administrative remedies is denied.

### 2.   Timeliness—Count Two

TCI next argues that Count Two should be dismissed as untimely.  Plaintiff's Title VII claim for gender discrimination was not included in her original complaint, and was not asserted until the Amended Complaint was filed on January 27, 2014, more than a month after the ninety-day filing period had expired.  42 U.S.C. § 2000e-5(f)(1).  TCI argues that Plaintiff's gender-discrimination claim in Count Two is therefore untimely unless it can be shown to relate back to her initial complaint.

Pursuant to Rule 15(c)(1)(B) of the Federal Rules of Civil Procedure, "[a]n amendment to a pleading relates back to the date of the original pleading when . . . the amendment asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out—or attempted to be set out—in the original pleading."  "Under Fed. R. Civ. P. 15(c), the central inquiry is whether adequate notice of the matters raised in the amended pleading has been given to the opposing party within the statute of limitations by the general fact situation alleged in the original pleading."  *Stevelman v. Alias Research, Inc.*, 174 F.3d 79, 86 (2d Cir. 1999) (internal citations and quotation marks omitted).  TCI argues that although Plaintiff's claims for race and gender discrimination relate to the same alleged adverse employment action, her gender discrimination claim does not relate back to the initial complaint because that complaint did not put TCI on notice of a potential gender discrimination claim.

TCI cites two cases in which courts found that an amendment of the pleadings to add employment discrimination charges based on a different protected class than was

originally alleged did not relate back to the original complaint, even if it was based on the same adverse employment action, because the original complaint contained no allegations that would have put the defendants on notice that the plaintiff was asserting multiple discriminatory motives.  In *Campbell v. A.C. Petersen Farms, Inc.*, 69 F.R.D. 457, 461 (D. Conn. 1975), the district court held that the plaintiff's addition of a gender discrimination claim did not relate back to his original complaint of racial discrimination because the plaintiff did not allege any act of sex discrimination in his original complaint and "the gravamen of that complaint was exclusively race discrimination."  *Id.*  Similarly, in *Wallace v. Stratford Bd. of Educ.*, 674 F. Supp. 67, 70 (D. Conn. 1986), the district court held that the plaintiff's addition of a claim for discrimination based on her handicap did not relate back to her original complaint of gender discrimination because "the original complaint made no reference to plaintiff's handicap," and the defendants thus were not on notice of that potential claim.  *Id.*

Plaintiff counters that she alleged gender discrimination in her administrative complaint, which put TCI on notice of that potential claim.  None of the cases cited by the parties address whether the Court can consider the administrative complaint, rather than the initial pleading, in deciding sufficiency of notice for the amended claim to relate back pursuant to Rule 15(c).  However, the Court need not address this issue because Plaintiff's initial complaint did make reference to gender discrimination in the context of her firing, although it did not specifically include a count for gender discrimination.  Paragraph 94 of the initial complaint states that "Plaintiff was singled out and treated with disparity based on her race *and gender* because the White male CEO, [Mr.] Nucci, publicly broadcasted similar information without prior approval and was not held accountable."  (Initial Compl. [Doc. 1-1] ¶ 94 (emphasis added).)  Similarly, in Paragraph

13

95, Plaintiff alleges that she was "further singled out and treated with disparity *based on her gender* when a male TCI Case Manager was not disciplined or terminated in any manner who had also participated in the interview with the New Haven Independent." (*Id.* ¶ 95 (emphasis added).)  In Paragraph 97, Plaintiff notes that her supervisors "failed to be accountable and exonerated themselves by placing the blame on the only African American *female.*"  (*Id.* ¶ 97 (emphasis added).)  These allegations specifically reference discrimination on the basis of Plaintiff's gender in connection with her firing and were sufficient to put TCI on notice that Plaintiff sought to allege a gender discrimination claim as well.  Therefore, the Court concludes that Count Two relates back to the initial complaint, which was timely filed, and TCI's motion to dismiss Count Two on the basis that it is untimely is thus denied.

### 3.    *Violation of Conn. Gen. Stat. § 31-51q—Count Three*

Finally, TCI moves to dismiss Count Three for failure to state a claim for which relief can be granted.  In order to state a valid claim pursuant to Section 31-51q, Plaintiff must allege three elements:  (1) that she was exercising rights protected by the First Amendment to the United States Constitution or by the Connecticut Constitution; (2) that she was fired because of her exercise of such rights; and (3) her exercise of such rights did not substantially or materially interfere with her bona fide job performance or her working relationship with her employer.  *Lopez v. Burris Logistics Co.*, 952 F. Supp. 2d 396, 406–07 (D. Conn. 2013).  TCI challenges the sufficiency of Plaintiff's factual pleadings on both the first or third elements of her Section 31-51q claim.

TCI argues that the first element fails because she has not alleged that her speech was constitutionally protected since it was made pursuant to her official job duties.  In *Garcetti v. Ceballos*, 547 U.S. 410, 422 (2006), the Supreme Court held that "when public

employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline."   The Connecticut Supreme Court has extended the holding of *Garcetti* to actions brought against private employers pursuant to Section 31-51q:  "Thus, we conclude that the rule in *Garcetti* . . . applies to claims under § 31-51q grounded in the [F]irst [A]mendment that are brought against private employers, and must be considered as a threshold matter."  *Schumann v. Dianon Sys., Inc.*, 304 Conn. 585, 611 (2012).  TCI asserts that based on the allegations in the Amended Complaint, Plaintiff has alleged only that her speech was made pursuant to her official duties, and that therefore her Section 31-51q claim must fail.

The only argument Plaintiff raises in her opposition is that the *Garcetti* rule is not applicable in this case because the Connecticut Supreme Court has not yet extended *Garcetti* to cover Section 31-51q claims made pursuant to the Connecticut Constitution, which misses the mark because Plaintiff's claim is based solely on the United States Constitution.   In the Amended Complaint, Plaintiff alleges that "[TCI] discharged Plaintiff because of her exercise of her *First Amendment* rights thereby depriving her of equal protection of the laws . . . of the State of Connecticut."  (Am. Compl. ¶ 121 (emphasis added).)  Plaintiff makes no mention of section 3, 4, or 14 of article first of the Connecticut Constitution in the Amended Complaint.   Therefore, Count Three is brought only under the First Amendment and the *Garcetti* rule clearly applies to her claim.

Under *Garcetti*, "[t]he objective inquiry into whether a[n] . . . employee spoke 'pursuant to' his or her official duties is 'a practical one.'"  *Weintraub v. Bd. of Educ. Of City School Dist. of City of New York*, 593 F.3d 196, 202 (2d Cir. 2010) (quoting *Garcetti*,

547 U.S. at 424).  "Speech can be 'pursuant to' a[]n employee's official job duties even though it is not required by, or included in, the employee's job description, or in response to a request by the employer."  *Id.* at 203.  Nonetheless, the fact that the speech concerned the subject matter of an employee's employment is nondispositive.  *Garcetti*, 547 U.S. at 421.  As other courts in this Circuit have recognized, "[t]he application of *Garcetti* requires a fact-specific inquiry."  *Caruso v. Massapequa Union Free School Dist.*, 478 F. Supp. 2d 377, 382–83 (E.D.N.Y. 2007).

TCI argues that because Plaintiff's job clearly involved monitoring and improving the sanitary and security conditions of Ruoppolo, and her partnership with Sergeant Johnson arose out of her position as Program Manager, her comments in the interview with the New Haven Independent could only have been made 'pursuant to' her official employment duties.  However, neither party includes a copy of the article referenced in the Amended Complaint.  Thus, without knowing what Plaintiff said, the Court obviously cannot determine the exact nature of the speech at issue in this case, particularly as the context of Plaintiff's termination plausibly implies that the article contained statements about HANH's historical performance and track record generally that might not qualify as speech made "pursuant to" Plaintiff's position as the Program Manager for Ruoppolo. The Court concludes that, at this preliminary stage, Plaintiff has pled minimally sufficient facts to show that she could have been engaged in constitutionally protected speech when she spoke to the New Haven Independent and will await a fully developed summary judgment record for a full, fact-specific, *Garcetti* analysis to be completed.  TCI's motion to dismiss Count Three is therefore denied with respect to this argument.

TCI also argues that Plaintiff has failed to plead sufficient facts to support the third element of her Section 31-51q claim—i.e., that her speech did not "substantially or

materially interfere" with the working relationship between Plaintiff and TCI.  Conn. Gen. Stat. § 31-51q.  "[T]he majority of the [Connecticut] Superior Court decisions and decisions from the United States District Court for the District of Connecticut hold that the plaintiff must plead and prove lack of substantial interference as an essential element under § 31-51q." *King v. The Connection, Inc.*, No. CV106015682S, 2011 WL 3211250, at *5 (Conn. Super. Ct. June 20, 2011).  TCI argues that because Plaintiff's comments damaged the relationship between HANH and TCI, she has failed to plead noninterference.  However, in the Amended Complaint, Plaintiff alleges that she informed her supervisor about the interview, was encouraged to participate, and was widely praised for the article immediately after it was published.  Therefore, she has alleged sufficient facts to show that her speech did not initially interfere with her relationship with her employer—TCI.  TCI's motion to dismiss Count Three on these grounds is therefore denied.

### B.      HANH's Motion to Dismiss

HANH moves to dismiss each of the claims against it, arguing that there is no legal authority to support a theory of aiding and abetting pursuant to Conn. Gen. Stat. § 31-51q as alleged in Count Four, that Plaintiff has failed to allege sufficient facts to state a claim pursuant to 42 U.S.C. §§ 1981 or 1983, and that Plaintiff has failed to state a claim for tortious interference with contract.

### 1.      *Aiding and Abetting Claim—Count Four*

HANH moves to dismiss Plaintiff's claim for "aiding and abetting" a violation of Section 31-51q, arguing that there is no legal basis for such liability.  Section 31-51q states that:

> [a]ny employer . . . who subjects an employee to discipline or discharge on account of the exercise of such employee of rights guaranteed by the first

17

> amendment to the United States Constitution or section 3, 4, or 14 of article first of the Constitution of the state, provided such activity does not substantially or materially interfere with the employee's bona fide job performance or the working relationship between the employee and the employer, shall be liable to such employee for damages caused by such discipline or discharge . . . .

Plaintiff makes no allegation in the Amended Complaint or her opposition briefing that HANH is her employer.  Rather, Plaintiff argues that the term "employer" is undefined in the statute, and claims that although HANH is not *her* employer, it is *an* employer, and thus may be held liable under the statute.  Plaintiff cites no case recognizing her construction of "employer" or her theory of liability.  In contrast, HANH cites multiple cases dismissing Section 31-51q claims asserted against defendants other than the plaintiff's employer.  For example, in *Smith v. AFSCME Council 4*, No. 05cv829 (JBA), 2007 WL 735815, at *1 (D. Conn. Mar. 8, 2007), the plaintiff sued her union and individual union leaders for "aiding and abetting" in her employer's discrimination against her, including a Section 31-51q count.  However, this claim was dismissed because the plaintiff had not sued her former employer, and she made no claim that the union was her employer.  *Id.* at *4 & n.7.  Other courts in the State have dismissed Section 31-51q claims asserted against the plaintiffs' individual co-workers or supervisors based on similar reasoning.  *See Nyenhuis v. Metropolitan Dist. Comm'n*, 604 F. Supp. 2d 377, 384–85 (D. Conn. 2009); *Maisano v. Congregation Or Shalom*, No. NHCV07403717S, 2009 WL 415696, at *3 (Conn. Super. Ct. Jan. 26, 2009).

Plaintiff's next argument, that as a remedial statute, the Connecticut Fair Employment Practices Act ("CFEPA") should be interpreted broadly to provide the greatest protections to her rights, is without merit.  Section 31-51q is not part of the CFEPA, and the CFEPA specifically contains a provision for aiding and abetting liability,

while Section 31-51q does not.  *See* Conn. Gen. Stat. § 46a-60(a)(5).  The Connecticut Supreme Court has held under similar circumstances that where one statute does not contain an explicit aiding and abetting provision while a related statute does, no cause of action for aiding and abetting will lie under the former.  *See Conn. Nat'l Bank v. Giacomi*, 233 Conn. 304, 325 (1995) ("The express provision for a form of aider and abettor liability in § 36-498 indicates that when the legislature intended to create aider and abettor liability, it had little trouble doing so." (internal citations and quotation marks omitted)).  By analogy, the presence of a provision for aiding and abetting liability in the CFEPA indicates that the Connecticut legislature knew how to create aider and abettor liability in civil rights statutes, and declined to do so with respect to Section 31-51q.

In her opposition, Plaintiff essentially asks the Court to create a new theory of tort liability implicating the Connecticut Constitution, without citing any authority in support of this interpretation and without distinguishing HANH's authority to the contrary. Given the concerns of federalism and comity, the Court declines to do so.  *Cf. Lopez v. Smiley,* 375 F. Supp. 2d 19, 26 (D. Conn. 2005) ("Mr. Lopez's state constitutional claims are clearly novel, they are complex, and they are not well developed under Connecticut law. In light of . . . the fact that federalism and comity concerns strongly suggest that recognition of new state constitutional torts should be determined on a case-by-case basis by *Connecticut courts* in the first instance, this Court will refrain from exercising supplemental jurisdiction over all of Mr. Lopez's Connecticut constitutional claims." (emphasis in original)).  Therefore, HANH's motion to dismiss the aiding and abetting claim in Count Four is granted.

2.      *Section 1981 and 1983 Claim—Count Five*

HANH moves to dismiss Plaintiff's claim pursuant to Sections 1981 and 1983 in Count Five for failure to state a claim because the only factual allegation regarding HANH's conduct in the Amended Complaint is that HANH expressed its displeasure with the article to TCI.  (Am. Compl. ¶ 89.)  HANH argues that this alone is insufficient to support a claim of racial discrimination.  Because Plaintiff did not address Count Five or rebut these arguments in her opposition, HANH further argues that Count Five should be deemed abandoned.  "When a plaintiff's specific claim is attacked in a motion to dismiss, a plaintiff must rebut the defendant's argument against that claim or it shall be deemed abandoned."  *Massaro v. Allingtown Fire Dist.*, No. 3:03-CV-00136 (EBB), 2006 WL 1668008, at *5 (D. Conn. June 16, 2006); *see also Ariztegui v. United Technologies Internat'l Operations, Inc.*, Civil No. 3:10cv672 (JBA), 2011 WL 5593155, at *4 (D. Conn. Nov. 17, 2011) ("Federal courts have the discretion to deem a claim abandoned when a defendant moves to dismiss that claim and the plaintiff fails to address in their opposition papers defendants' argument dismissing such a claim.").  Plaintiff had the benefit of a pre-filing conference, an opportunity to amend her complaint, three extensions of time, and the Court's consideration of her *nunc pro tunc* opposition.  With all this, she failed to address HANH's arguments for dismissing her Section 1981 and 1983 claims, or to even mention Count Five in her opposition.  Therefore, the Court deems Plaintiff to have abandoned Count Five and grants HANH's motion to dismiss that count.

3.      *Tortious Interference with Contract Claim—Count Six*

In order to state a claim for tortious interference under Connecticut common law, Plaintiff must allege the following four elements:  1) the existence of a contract or a business relationship; 2) HANH's knowledge of that relationship; 3) HANH's intentional

20

and tortious interference with that relationship; and 4) actual loss suffered by Plaintiff. *Rioux v. Barry*, 283 Conn. 338, 351 (2007) (elements for intentional interference with contractual relations); *Hi–Ho Tower, Inc. v. Com–Tronics, Inc.*, 255 Conn. 20, 27 (2000) (elements for intentional interference with business expectancy).  Plaintiff must also allege that HANH had "at least some improper motive or improper means" when it interfered with her employment relationship with TCI.  *Biro v. Hirsch*, 62 Conn. App. 11, 21 (2001).  In *Biro*, the Connecticut Appellate Court defined improper means or motive as "fraud, misrepresentation, intimidation or molestation . . . or that the defendant acted maliciously."  *Id.*  HANH argues that because the sole factual allegation regarding its conduct is that it expressed its displeasure with the article, and because Plaintiff's remaining allegation that the interference was "malicious" is conclusory, she has failed to allege that HANH had an improper motive or used improper means to interfere with her employment with TCI.

Plaintiff counters that she is entitled to the reasonable inference that the words or actions HANH used in expressing its displeasure were direct enough to cause TCI to terminate her employment.  In the Amended Complaint, Plaintiff alleges that TCI went from praising the article and her work at Ruoppolo to firing her for that interview in less than twenty-four hours.  The only thing that was alleged to have changed was HANH's expression of displeasure with the article.  Plaintiff alleges that her supervisors continued to express their admiration for her passion even as they were firing her, explaining that she had jeopardized the relationship with HANH and "had to pay."  Based on the swiftness and severity of the change in TCI's behavior towards Plaintiff, all of which was based on TCI's funder's displeasure, it is plausible to infer that HANH used its status as a funder coercively such that TCI was convinced that Plaintiff "had to pay" by losing her

job.  Therefore, the Court concludes that Plaintiff has alleged minimally sufficient facts to state a plausible claim for tortious interference and denies HANH's motion to dismiss Count Six.

For the foregoing reasons, HANH's motion to dismiss is granted with respect to Counts Four and Five and denied with respect to Count Six.

**III.    Conclusion**

For the reasons discussed above, TCI's Motion [Doc. # 25] to Dismiss is DENIED, and HANH's Motion [Doc. # 27] to Dismiss is GRANTED with respect to Counts Four and Five and DENIED with respect to Count Six.

IT IS SO ORDERED.

_____/s/_____

Janet Bond Arterton, U.S.D.J.

Dated at New Haven, Connecticut this 24th day of June, 2014.